SHERRY J. BROWN, Indiv. and as Adm'r of the Estates of Rachel Brown, *et al.*, *et al.*, Plaintiffs-Appellants, v. FORD MOTOR COMPANY, Defendant-Appellee.

First District (1st Division)    No. 1—97—1804

Opinion filed June 30, 1999.

Arthur S. Gold, Gary R. Williams, and Michael W. Rath, of Chicago, for appellants.

Donohue Brown Mathewson & Smyth, of Chicago (John T. Coleman, Richard B. Foster, and Karen Kies DeGrand, of counsel), for appellee.

JUSTICE TULLY delivered the opinion of the court:

Plaintiffs, Sherry Brown and Emma Mae Brown, brought a product liability action against defendant, Ford Motor Company. Sherry Brown sued individually and as the administrator of the estates of Rachel, Veronica, and Miriam Brown. Emma Mae Brown sued as the administrator of the estate of Brian Brown. Sherry Brown was the only survivor of an accident involving a van that defendant manufactured. A jury found for defendant and answered special interrogatories in defendant's favor. The trial court denied plaintiffs' posttrial motion, and plaintiffs appeal. This court has jurisdiction pursuant to Supreme Court Rule 301 (155 Ill. 2d R. 301).

We affirm for the following reasons.

The relevant facts are as follows. On December 22, 1990, Miriam Brown was driving his 1989 Ford Econoline van southbound on Route I-57. Sherry Brown was a passenger in the van with Rachel, Veronica, and Brian Brown. It was a cold day with freezing rain and snow. The van passed a car driven by James Bell and then struck the rear of a van driven by Marc Drayton, which slid into the shoulder of the highway. Brown's van slid off the road, hit a concrete abutment in the median, and exploded. Sherry Brown was the only survivor of the accident.

At trial, James Bell testified that Brown's van passed him going 15 to 20 miles per hour faster than Bell's car. He saw Brown's van slide and hit the concrete abutment. He did not know how far behind Brown's van he was when he saw the van slide. Bell estimated the van's speed was 20 to 25 miles per hour before it hit the abutment, but he stated that it was very possible that the van was going faster than that.

Plaintiffs alleged that faulty nylon fuel lines in Brown's Ford Econoline van melted, leaked gasoline, and therefore caused the explosion. The evidence showed that Ford installed nylon fuel lines in its Econoline vans in 1985 or 1986 and, at that time, Ford was the only vehicle manufacturer using such fuel lines. However, some European car companies used nylon tubing in their engines, and, subsequently, General Motors and Chrysler used nylon fuel lines. In addition, Ford knew when it installed them that the nylon fuel lines had temperature limitations and that it should not install such lines where that limit would be exceeded. Cost was one of the factors Ford considered in its decision to use nylon fuel lines. The trial court refused to allow plaintiffs to introduce evidence that Ford changed from nylon fuel lines to stainless steel fuel lines in 1989, which was after Brown's van was made but before the accident. The new fuel lines were made of Teflon surrounded by stainless steel wire braiding. Such lines were

feasible when Brown's van was manufactured. Plaintiffs sought to introduce the evidence to rebut any implication that the nylon lines were proper because other companies had used them.

The evidence also showed that the engine area contained several potentially combustible fluids. There were about 12 gallons of such fluids, which included radiator, transmission, brake, power steering, and windshield washer fluids, Freon gas, and oil.

Plaintiffs presented expert witness testimony that the source of the fire was a severed nylon fuel line that leaked gasoline. According to the expert, the stainless steel braided fuel lines would not have allowed gasoline to leak out. In the expert's opinion, the van was therefore unreasonably dangerous.

Defendant's reconstruction expert witness, Geoffrey Germane, testified that he reviewed various depositions, examined the accident scene, and performed test crashes. Germane also reviewed 28 crash tests of the Econoline van that defendant was required to complete for federal certification. The vans did not catch fire in those tests, but they did not have gas in them during the tests. For the reconstruction crash tests, Germane calculated how much energy Brown's van absorbed by examining the vehicle and by looking at reconstruction crash tests that Ford had conducted. He compared Brown's van to an undamaged van to determine how much crush damage occurred. Ford performed the reconstruction crash tests using a similar concrete abutment and vans similar to Brown's van. The first test's speed was 36.7 miles per hour, and the second test's speed was 47.5 miles per hour. Defendant showed the jury the first crash test at normal speed and in slow motion. The damage to the vehicle in that test was similar to but not as great as the damage to Brown's van. The jury also saw the second crash test at normal speed and in slow motion. Using the tests, Germane computed the crash energies and estimated that the impact speed of Brown's van was 44 to 46 miles per hour. In Germane's opinion, Bell's estimate that Brown's van was traveling 20 to 25 miles per hour before it hit the abutment was incorrect. According to Germane, the energy for that speed is much lower than that for the first crash test's speed of 36.7 miles per hour.

Defendant's fire expert witness, Walter Newell, testified that there were two fires at the accident, one in the cargo area and one in the engine compartment. In his opinion, gasoline did not play a role in the cause or origin of the fires.

Larry Ragan, defendant's automotive consulting engineer, also testified. He reviewed the evidence and tests. In his opinion, the fuel line system in Brown's van was safe.

The jury found in defendant's favor. In addition, it stated in its

answer to special interrogatories that defendant's fuel system was not dangerous and did not cause a fire.

On appeal, plaintiffs contend that the trial court erred in: (1) admitting into evidence videos of defendant's crash reconstruction, even though an eyewitness had already testified as to the speed of the van before the accident; (2) allowing the jury to view the reconstruction videos in slow motion; and (3) barring evidence that defendant changed its fuel lines from plastic to metal, after it manufactured the van, but before the accident.

■ Plaintiffs first argue that the trial court erred in admitting the crash reconstruction evidence because Bell had already provided eyewitness testimony about the speed of Brown's van. "Whether reconstruction evidence should be admitted at trial is a matter within the trial court's discretion." *Palmer v. Craig*, 246 Ill. App. 3d 323, 327, 615 N.E.2d 1294, 1296-97 (1993). " '[E]xpert reconstruction testimony is proper, even where there is an eyewitness, if what the expert offers is "knowledge and application of principles of science beyond the ken of the average juror." ' " *Watkins v. Schmitt*, 172 Ill. 2d 193, 205, 665 N.E.2d 1379, 1385 (1996), quoting *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 546, 658 N.E.2d 371, 373 (1995), quoting *Plank v. Holman*, 46 Ill. 2d 465, 471 (1970). Therefore, the existence of an eyewitness is not the conclusive factor in deciding whether to admit such expert testimony. *Watkins*, 172 Ill. 2d at 206, 665 N.E.2d at 1385. The supreme court held in *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353, 359, 392 N.E.2d 1 (1979), that "automobile speed [was] not a matter beyond the ken of the average juror." Moreover, "any lay person with a reasonable opportunity to observe and ordinary experience with moving vehicles can estimate the speed of a car." *Watkins*, 172 Ill. 2d at 206, 665 N.E.2d at 1385.

■ In this case, we do not find that the trial court abused its discretion in admitting the reconstruction evidence. The trial court heard Bell's testimony about the speed of Brown's van and was able to determine whether he had a reasonable opportunity to observe the van. The court found Bell's testimony to be "equivocal" and exercised its discretion in allowing the reconstruction videos. On cross-examination, Bell testified that he could have been a half-mile away from Brown's van when it started to slide, but he couldn't "tell how far back it [was]." Bell then stated that Brown's van was "some distance north" when it slid. In addition, although Bell testified that the van's speed was 20 to 25 miles per hour, when asked whether it was possible that it was faster, he replied, "It's very possible, because that's the reason I hesitated before when the question was asked how fast he was going." We therefore do not find that the trial court erred in allowing the reconstruction evidence.

■ Plaintiffs next contend that the trial court erred in allowing the jury to view the reconstruction and federal certification videos in slow motion because plaintiffs were prejudiced. "A videotape is admissible for that purpose if it fairly and accurately shows whatever it intends to show and if it is not unduly prejudicial." *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 202, 668 N.E.2d 8, 10 (1996). Whether experimental evidence meets the criteria for admission is left to the trial court's sound discretion. *Rios v. Navistar International Transportation Corp.*, 200 Ill. App. 3d 526, 558 N.E.2d 252 (1990). In this case, the trial court properly exercised its discretion in allowing the jury to view the federal certification and reconstruction videos in slow motion. First, it was explained at trial that the federal certification videos were made to satisfy federal testing requirements. Second, plaintiffs argue that the slow motion made the video crashes even more real and therefore made them prejudicial. We disagree and do not find an abuse of the trial court's discretion.

■ Finally, plaintiffs argue that the trial court erred in barring evidence that defendant changed the fuel lines from plastic to metal after it manufactured Brown's van but before the accident. The trial court barred the evidence because of public policy reasons, such as the possible chilling effect on safety improvements. Evidence of a subsequent design change is not admissible to show either negligence or wilful and wanton conduct in a product liability action. *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 541 N.E.2d 643 (1989). In *Smith v. Black & Decker (U.S.), Inc.*, 272 Ill. App. 3d 451, 650 N.E.2d 1108 (1995), the appellate court affirmed the trial court's rejection of evidence of post-manufacture but pre-injury modifications to a power tool. The appellate court stated that it found "the same policy consideration, *i.e.*, the potential chilling effect on safety improvements, present in product liability actions as in negligence actions regardless of whether the modifications were pre-injury or post-injury." *Smith*, 272 Ill. App. 3d at 457, 650 N.E.2d at 1113. In this case, we follow *Smith* and find that the trial court did not abuse its discretion in barring the evidence of changed fuel line materials.

In light of the foregoing, we affirm the judgment of the circuit court.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.