DAWN FELBER, Indiv. and as Next Friend of Hannah Hildebrandt, a Minor, Plaintiff-Appellant, v. KELLY LONDON, Defendant-Appellee.

Second District   No. 2—02—1226

Opinion filed January 30, 2004.

David C. Van Dyke, Andrew P. Bleiman, Donald F. Ivansek, Brian A. Schroeder, and Jean M. Golden, all of Cassiday, Schade & Gloor, of Chicago, for appellant.

Mark A. Dinos and Jeffrey A. Siderius, both of Morse & Bolduc, of Chicago, for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiff Dawn Felber, in her own capacity and as next friend of her minor daughter, Hannah Hildebrandt, appeals from the trial court's orders denying her posttrial motion and entering judgment in favor of defendant, Kelly London. We affirm.

On February 20, 1999, Felber and Hildebrandt were in Felber's car, stopped at an intersection, when London hit them from behind. Felber brought a two-count complaint against London, alleging that London's negligence caused Felber and Hildebrandt to suffer personal injury and pecuniary loss. A jury found in favor of London and against Felber. The trial court denied Felber's posttrial motion, and this appeal followed.

■ Felber contends on appeal that the trial court erred in allowing London to inquire at trial about prior injuries that Felber had suffered to her back and neck. In general, the admission of evidence lies within the trial court's discretion, and we will not disturb a trial court's ruling unless the court abuses its discretion. *Maffett v. Bliss*, 329 Ill. App. 3d 562, 571 (2002). An abuse of discretion will be found only where no reasonable person would take the view adopted by the trial court. *Janky v. Perry*, 343 Ill. App. 3d 230, 234 (2003).

During pretrial discovery, the trial court set deadlines for the parties to disclose the identity and opinions of expert witnesses. While Felber disclosed Dr. Richard Feeley as her expert before her deadline, London missed her deadline and moved for leave to disclose her expert only after another 11 months had passed. Felber objected to London's motion, and the court barred London from disclosing any new medical witnesses. However, the court did allow London to make disclosures of witnesses who had already been disclosed by Felber. London subsequently disclosed that she might call "any and all of the medical witnesses" disclosed by Felber and that those witnesses would testify that Felber suffered from preexisting and permanent injuries before the collision. These witnesses would also testify that the collision did not aggravate those injuries, nor was it the proximate cause of Felber's claimed injuries.

Felber filed a motion *in limine* seeking to bar London from presenting any evidence regarding a 1997 auto accident involving Felber and any injuries she might have sustained in it. The court granted this motion in part and barred London from asking any questions regarding any prior auto accidents. However, the court also denied the motion in part and allowed London to inquire about Felber's medical condition from January 1, 1998, to the time of trial.

The case was then tried to a jury. Felber testified that she sought treatment from a chiropractor for shoulder and neck pain from February to September 1998. She began treatment with Dr. Feeley in November 1998. At that time, she still complained of "some neck problem." Dr. Feeley's course of treatment included osteopathic manipulation, acupuncture, and nutritional supplements. By the end of 1998, her neck problem had improved, although she was "still having problems" with her neck during the first six weeks of 1999. Felber saw Dr. Feeley on February 18, 1999. At that time, her neck was "feeling pretty good." She did not experience daily pain in her neck or frequent numbness or weakness in her hands or arms.

On February 20, 1999, Felber was stopped at a stop sign when her car was struck by London's car. She described the collision as a "huge bang" and stated that her body "moved forward" at the impact. She was wearing a neck brace at the time of the collision. Dr. Feeley had prescribed the brace for use when she was a passenger, but she decided to wear it when she drove her car. Felber went to the emergency room, where she began to experience pain in the back of her head, in her neck, between her shoulder blades, and in her lower back. She had not experienced the back pain before the collision.

Felber saw Dr. Feeley on February 22, 1999. Dr. Feeley suggested that she continue her treatment of manipulation, acupuncture, and nutritional supplements. He also prescribed muscle relaxants and more frequent visits, and, in April, he prescribed physical therapy. While the therapy helped "in many regards," Felber had to return for additional therapy in 2000 and 2001.

Starting in the spring of 1999, Felber also experienced numbness in her fingers, hands, and arms. These sensations sometimes prevented her from sleeping. As of trial, Felber was still being treated by Dr. Feeley. She still experienced problems between her shoulders and, occasionally, tenseness in her neck.

On cross-examination, Felber testified that she began seeing the chiropractor after she experienced neck pain when she turned her head while backing her car out of the garage. She also experienced "an achy feeling" in her neck a couple of weeks after riding a roller coaster in August 1998. In October 1998, she began physical therapy,

including ultrasound and massage treatment, for her neck and back. Felber then began treatment with Dr. Feeley in November 1998. She stated that she had complained to Dr. Feeley of pain in her neck and up to the back of her head. In the year prior to the collision, she had "[r]arely" experienced numbness in her hands, and she did not experience numbness in her hands and arms immediately after the collision. The treatments she received from Dr. Feeley both before and after the collision were "[v]ery similar." She had ongoing complaints of neck pain prior to the collision and she was "not entirely" cured or symptom-free before the collision. She anticipated that she would have had to continue her treatments even if the collision had never occurred.

Felber had been wearing a neck brace since Dr. Feeley had prescribed it in December 1998. While Dr. Feeley told her to use it when she was a passenger in a car, she also used it occasionally while doing housework and regularly while driving. She stopped wearing the brace in March 1999.

Although Felber had not been to a chiropractor since September 1998, she did call Dr. Johnson, the chiropractor who had treated her previously, in May 1999. She told Dr. Johnson that she was involved in a traffic accident and asked him if she had a preexisting condition.

London testified that, on the morning of the collision, she was driving at no more than 15 miles per hour as she approached Felber's car, which was stopped at a stop sign approximately one-half block from London's home. As she applied her brakes and slowed down, her car slid about 50 feet before hitting Felber. London described the impact with Felber's car as "light," and noted that the airbag in her car did not deploy when the collision occurred. Felber's car did not move forward when it was hit, and the two cars were still touching when they came to rest. London did not notice any damage to either car.

London asked Felber why she was wearing a neck brace at the time of the collision. Felber told her that she had injured her neck a year before and wore the brace "for prophylaxis to prevent any further injury from pot holes in the road."

Dr. Feeley testified via an evidence deposition. He testified that, on February 22, 1999, Felber's condition was different than it had been before. Specifically, she had a "nonphysiological ligamentous strain of the upper neck" that did not exist on prior visits. Dr. Feeley had never seen that type of strain occur without trauma, and it was consistent with the history of the collision that Felber had given. He opined that, to a reasonable degree of medical certainty, the injuries that he found on February 22, 1999, were "directly causally related" to the collision.

He also opined that Felber's complaints of numbness in her arms and hands were "causally related and proximally and directly related" to the collision. Her symptoms of neck pain, numbness in the arms, and shoulder pain were "directly a continuation of relationship to the trauma" from the collision.

On cross-examination, London inquired about an X ray from November 1998 that showed that Felber had degeneration of the cervical spine and "early signs of osteoarthritis." Dr. Feeley characterized this as "minimal disk disease." He opined that the degeneration and arthritis "will be accelerated and has been accelerated" by the collision. According to Dr. Feeley, the arthritis would have probably progressed even if Felber had not been involved in the collision; however, the arthritis "has been accelerated by the trauma that she received" in the collision.

In December 1998, Felber complained of cracking in her neck when she turned, headaches, and pain in her neck and upper back between the shoulders.

On appeal, Felber argues that the admission of evidence of a plaintiff's prior injuries is *per se* reversible error when the defendant fails to present expert testimony that the prior injuries caused the current claimed injuries. Felber cites *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49 (2000), for support. In *Voykin*, the plaintiff and the defendant were involved in a traffic accident. The plaintiff then sought treatment for neck and back pain. The trial court allowed the defendant to question the plaintiff and the plaintiff's expert witness about a lower back injury that the plaintiff had suffered five years before the accident in question and to introduce evidence relating to the treatment of prior injuries. The trial court also allowed the defendant to introduce evidence that the plaintiff had previously suffered from unspecified neck problems.

Our supreme court held:

"[I]f a defendant wishes to introduce evidence that the plaintiff has suffered a prior injury, *** the defendant must introduce expert evidence demonstrating why the prior injury is relevant to causation, damages, or some other issue of consequence. This rule applies unless the trial court, in its discretion, determines that the natures of the prior and current injuries are such that a lay person can readily appraise the relationship, if any, between those injuries without expert assistance." *Voykin*, 192 Ill. 2d at 59.

Our supreme court reviewed the evidence and concluded that the disputed evidence should have been excluded. The court found that the evidence did not

"come close to demonstrating what plaintiff's 'neck problems' were,

when he suffered them, or when he last suffered from symptoms. Nothing about the evidence presented by defendant has any tendency to make it less likely that defendant caused plaintiff's neck injury or that defendant caused plaintiff to suffer damages. Without expert testimony establishing both the nature of plaintiff's prior 'neck problems' as well as the relationship between those prior problems and plaintiff's current claim, an average juror could not readily appraise the effect of the prior problems upon plaintiff's current claim." *Voykin*, 192 Ill. 2d at 60.

■ Our review of the record leads us to conclude that the evidence in this case is such that the jurors could readily appraise the relationship between the injuries of which Felber complained after the collision and her preexisting injuries without additional expert assistance; thus, the trial court did not abuse its discretion in allowing London to introduce evidence of Felber's preexisting injuries. Unlike the evidence in *Voykin*, there was specific testimony, from both Felber and Dr. Feeley, regarding the extent of Felber's preexisting injuries and symptoms and the treatments she received in the months, even days, before the collision. Both Felber and Dr. Feeley were specifically questioned about Felber's condition after the collision, and Dr. Feeley testified about the possible effects of the collision on Felber's preexisting condition. This is precisely the type of testimony that obviates the need for additional expert testimony. Unlike the evidence in *Voykin*, the nature of Felber's prior condition and its possible relationship to her current claim were clearly established. The jury was free to make its own determination, in light of both parties' description of the collision, whether the collision caused, or contributed to, Felber's current condition. We find no abuse of discretion in the trial court's admission of testimony regarding Felber's prior injuries.

For these reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

BOWMAN and GILLERAN JOHNSON, JJ., concur.